# 1B

## THE STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF MONTCALM

REBECCA JASINSKI, as the Personal Representative
of the Estate of NICHOLAS DANIEL BRAMAN, deceased,

Plaintiff,

                        No: 10- $H$-$13280$ - NO
                        HON.
v                              DAVID A. HOORT P28492

SHERI TYLER, JAMIE LOVELACE,
MARY SOMMERS, RHODA DIETRICH,
MARIANNA UDOW, LAURA CHAMPAGNE, TED FORREST
CHAD CAMPBELL and COMMUNITY HOPE
CHRISTIAN COUNSELING AND MENTAL HEALTH CENTER
joint and severally,

Defendants.

GEOFFREY N. FIEGER (P30441)
VERNON R. JOHNSON (P39219)
GREGORY W. WIX (P65424)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-55550.



A TRUE COPY
CLERK OF MONTCALM COUNTY

### PLAINTIFFS' COMPLAINT AND JURY DEMAND

**There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in the complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge.**

By:   Gregory W. Wix (P65424)

**NOW COME** Plaintiff, REBECCA JASINSKI, as the Personal Representative of the Estate of NICHOLAS DANIEL BRAMAN, deceased, by and through their attorneys, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C., and for their First Amended Complaint against Defendants states unto this Honorable Court as follows:

1. The Plaintiff's Decedent NICHOLAS BRAMAN (a legal minor) was residing at home with his father in Montcalm, Michigan at the time of his death.

2. The Plaintiff's Personal Representative is REBECCA JASINSKI, his biological mother.

3. The Defendant SHERI TYLER (hereinafter "TYLER") was at all times pertinent hereto acting in her capacity as a Montcalm County Child Protective Services worker employed by the Michigan Department of Human Services.

4. The Defendant MARY SOMMERS (hereinafter "SOMMERS") was at all times pertinent hereto acting in her capacity as a Saginaw County Child Protective Services worker employed by the Michigan Department of Human Services.

5. The Defendant JAMIE LOVELACE (hereinafter "LOVELACE") is a supervisory employee and/or agent of Montcalm County Child Protective Services.

6. The Defendant RHODA DIETRICH (hereinafter "DIETRICH") is a supervisory employee and/or agent of Saginaw County Child Protective Services.

7. The Defendant MARIANNA UDOW (herein after "UDOW") is the former Director of the Michigan Department of Human Services (MDHS) and the concomitant head of the Montcalm and Saginaw County Child Protective Services Division of the MDHS from January, 2004 through August, 2007 and did business throughout Michigan.

8. The Defendant LAURA CHAMPAGNE (herein after "CHAMPAGNE") is the former Chief Deputy Director of the Michigan Department of Human Services (MDHS) under UDOW.

9. The Defendant TED FORREST (herein after "FORREST") did business throughout Michigan, as the manager of the State of Michigan Child Protective Services Program, during Ms. UDOW's tenure.

10. Defendant CHAD CAMPBELL is a licensed social worker in the state of Michigan and is the Director of Defendant COMMUNITY HOPE CHRISTIAN COUNSELING AND MENTAL HEALTH CENTER they did business throughout Michigan, including Montcalm County.

11. Each of the MDHS/CPS Defendants is being sued in their individual capacities, as joint participants, for the actions they took under color of law.

12. Each of the MDHS/CPS Defendants had a "special relationship" with NICHOLAS DANIEL BRAMAN, as a reported victim of child abuse/neglect, and were obligated to protect him from further abuse and neglect by properly implementing the Federal Child Welfare Program/Michigan Child Protection Act in Montcalm and Saginaw Counties, as a matter the child's constitutional liberty interests and his procedural and substantive due process rights.

13. Each of the CPS Defendants acted in bad faith, recklessly in violation of, and otherwise with deliberate indifference of, the Plaintiff's clearly established federal statutory and constitutional liberty and due process rights to protection from further child abuse and neglect.

14. As a result, the Plaintiff Decedent NICHOLAS DANIEL BRAMAN was drugged and poisoned to death in his father's Montcalm County home on or about August 15, 2007.

15. Evidence of NICHOLAS DANIEL BRAMAN'S abuse was reported to the Michigan Child Protective Services in Montcalm and Saginaw Counties before his death.

16. The cause of action arose in Montcalm County, Michigan.

17. The amount in controversy exceeds Seventy Five Thousand ($75,000.00) Dollars.

## GENERAL ALLEGATIONS

18. The Plaintiff hereby adopts and incorporates by reference the allegations set forth above in paragraphs 1-16 as if set forth here paragraph by paragraph.

19. Every state operates a child welfare program, pursuant to federal mandates. The principal goals of all public child welfare programs are to assure the safety, permanency, and well-being of children. In 1997, with the passage of the Federal Adoption and Safe Families Act (Public Law 105-89), Congress established that "the child health and safety shall be the paramount concern" of the state child welfare agencies, including MDHS. (Section 101.(a)(15)(A)).

20. By federal law, each child welfare program is required to have a mechanism by which it receives reports from professionals and from the community at large w hen there is suspicion that children have been abused or neglected. In Michigan, MDHS operates telephone hotlines at the county level for this purpose.

21. MCHS employs child welfare investigators to investigate child abuse and neglect reports. The stated purposes of these investigations are 1) to determine whether a preponderance of evidence indicates that child maltreatment has occurred, (MCL 722.628 d), 2) to assess the risk to involved children to determine, among other things, whether a

substantiated abuse/neglect report should be placed on the Michigan Central Registry (MDHS Children's Protective Services manual CFP 711-4), and 3) to determine whether children are in a situations so dangerous that they can only be protected by placement in MDHS custody or replacement in a different foster home.

22.     The purpose of Children's Protective Services (CPS) is to assure that children are protected from further physical or emotional harm caused by a parent or other adult responsible for the child's health and welfare.

23.     MDHS/CPS staff is legally required to intervene to safeguard the rights and welfare of children whose families are unable or unwilling to do so.

24.     By law, the MDHS/CPS staff has the responsibility to receive and to respond to any complaint of child abuse, child neglect, sexual abuse, sexual exploitation, maltreatment or improper custody.

25.     In each case where, as here, there is some evidence of child abuse or neglect the MDHS/CPS staff is required to complete a safety assessment to identify present or immediate danger of harm to a child during the investigation and at other important points during the life of the case.

26.     Complaints of suspected child abuse or neglect originate from various sources, including professionals mandated by law to report, the general public, and intradepartmental referrals.

a. Professionals mandated by law to report include a physician, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, a person licensed to provide emergency medical care, audiologist, psychologist, marriage and family therapist, licensed professional counselor, certified social worker, social worker, social work technician, school administrator, school counselor or teacher, law enforcement officer, member of the clergy, or regulated child care provider.

27.     As part of its general intake of child abuse/neglect complaints the

MDHS/CPS is legally required to take the following action:

a. Respond promptly to complaints of alleged neglect, abuse, exploitation or
   improper custody of children in order to determine the validity of the complaint;

b. Determine whether the complaint is to be investigated by Agency CPS staff or
   referred to the prosecuting attorney for law enforcement investigation (PA/LE);

c. Complete a safety assessment on all families, except families CPS is unable to
   locate, and situations in which no evidence [at all] of child abuse/neglect is found.

d. Determine whether there is a preponderance of evidence of child abuse or neglect;
   and

e. Evaluate the risk of future harm to the children in the home, using factors which
   present risk of immediate harm (safety) and interventions which can keep the
   child safe, and determine whether the children should remain in the home or
   whether emergency action is required.

28.     The Michigan Child Protection Act makes the MDHS/CPS staff the

appropriate point for receipt of ALL complaints of child abuse or neglect, as these terms

are defined by law.

29.     By law, the MDHS/CPS staff must commence the investigation of a

complaint within 24 hours of receipt of a complaint, although the alleged seriousness of

the risk to the children may dictate a more immediate response.     Commencing an

investigation requires contact with someone other than the referring person within 24

hours of receipt of a complaint to assess the safety of the child and determine department

response.

30.     The MCHS/CPS worker must initiate a field investigation or a preliminary

investigation, including contact with the assigned service worker, and, if appropriate, the

licensing worker within 24 hours.

31. The CPS investigation was required to be completed within 30 days of the

initial report, under the CPS administrative rules and services manual.

32. During the investigation, the CPS investigator was further required to:

a. Contact the physicians who examined and treated the child, review the available medical evidence, and secure the child's medical report; (see CFP 713-1);

b. Immediately assess the safety needs of the child, and take all necessary action to prevent further abuse, and to safeguard and enhance the child's future welfare; (CFP 712-4, 713-3; MCL 722.628(2));

c. Involve law enforcement to assist in the investigation and to help prevent future/further child abuse where, as here, the child had been subjected to severe physical injury under MCL 722.638(3)(c); CFP 712-3;

d. Contact and interview the witnesses to the child's physical injuries;

e. Immediately assess the child's living and habitation sites (CFP 712-4; 713-3); and,

f. Complete the investigation within 30 days of receiving the initial complaint. (See CFP 713-9).

33. In addition, MCL 722.683 of the Child Protection Act requires MDHS/CPS to submit a petition to the court if MDHS/CPS determines that the parent has abused the child or a sibling of a child and the abuse included among other things "battering, torture, or other severe physical abuse." This procedural framework is specifically intended to protect children such as NICHOLAS DANIEL BRAMAN and as noted by the OCO this procedural statute should have been utilized by Montcalm and Saginaw County CPS.

34. There was a long history of the abuse suffered by NICHOLAS DANIEL BRAMAN as well as his siblings, OLIVER FRANCIS BRAMAN and TYLER SCOTT BRAMAN and RACHEL JASINSKI (step-daughter) by their father OLIVER WAYNE BRAMAN.

FREGER, PREBER, KENNEY, JOHNSON & GREOLX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 1930 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

35. On **August 26, 1998** CPS received a complaint that OLIVER WAYNE BRAMAN was verbally and physically abusive to the above mentioned children and struck one of the children so hard that all the blood vessels in the child's nose were ruptured. That complaint was denied by CPS

36. In **February of 1999** a complaint was made to CPS alleging that OLIVER WAYNE BRAMAN was mentally cruel and that the children were living in poor living conditions. Again, CPS, including Defendant LOVELACE, denied the complaint.

37. In **April of 1999**, another complaint was made to CPS regarding the living conditions of the children, including septic issues and broken glass in the children's play areas. CPS denied the complaint.

38. In **June of 2000**, another complaint was made to CPS alleging that OLIVER WAYNE BRAMAN had threatened to kill NICHOLAS DANIEL BRAMAN and that NICHOLAS DANIEL BRAMAN was afraid of OLIVER WAYNE BRAMAN. It was also alleged that OLIVER WAYNE BRAMAN and his live-in girlfriend had pulled the children's teeth out before they were ready to come out naturally. CPS, including Defendant LOVELACE denied the complaint.

39. In **April of 2002**, another complaint was made to CPS alleging that OLIVER WAYNE BRAMAN was withholding medication from his children and he was making NICHOLAS DANIEL BRAMAN take baths with his live-in girlfriend and grab her breast. Again, CPS denied the complaint.

40. In **February 2004**, another complaint was made to CPS alleging that OLIVER WAYNE BRAMAN assaulted his son OLIVER FRANCIS BRAMAN by throwing him off the porch and kicking him because he could not find his glasses.

OLIVER WAYNE BRAMAN also believed that OLIVER FRANCIS BRAMAN was afraid of the dark, so he dropped OLIVER FRANCIS BRAMAN off miles away from home at 10:30pm on January 10th and left him to find his way home. Afterwards, OLIVER WAYNE BRAMAN did the same thing with his son TYLER SCOTT BRAMAN. Also discovered as a result of this complaint was that the children were required to compare their public hair. In interviews OLIVER FRANCIS BRAMAN and TYLER SCOTT BRAMAN told CPS of beatings they received on their bare buttocks and pliers on their fingers. CPS opened a case for documentation purposes only, but closed the case without any further action.

41.  Also in **February of 2004**, REBECCA JASINSKI reported to CPS that she attended a PPO hearing regarding OLIVER WAYNE BRAMAN and informed CPS that OLIVER FRANCIS BRAMAN and TYLER SCOTT BRAMAN attended the hearing with her, but they were so afraid of their father that they hid under the benches.

42.  In **June of 2006**, OLIVER WAYNE BRAMAN was reported to CPS for allegations of child molestation of a neighbor. During this investigation it was revealed that OLIVER WAYNE BRAMAN *"punishes kids with a cow prodder [sic]..."* Again, CPS, including Defendant LOVELACE denied that the children were being abused or neglected and completely **failed to** *"investigate, collect evidence, or reach a disposition on the allegation that Mr. Braman used a cattle prod on his children,"* according the Office of the Children's Ombudsman.

43.  During 2007 all of the children still lived with OLIVER WAYNE BRAMAN, in Montcalm County, but on **August 1, 2007**, TYLER SCOTT BRAMAN and OLIVER FRANCIS BRAMAN called their mother REBECCA JASINSKI who was

living in Saginaw County and informed her that they could no longer take the abuse of OLIVER WAYNE BRAMAN and that they were planning to run away.

44.    REBECCA JASINSKI called Saginaw CPS to report that TYLER SCOTT BRAMAN and OLIVER FRANCIS BRAMAN planned to run away due to the abuse and were intending to hide in a McDonald's parking lot and wait for REBECCA to pick them up. Saginaw CPS worker, KEVIN ZABORNEY, spoke with REBECCA and noted in his records that she had made several complaints before that were not investigated. ZAMBORNEY then informed REBECCA that TYLER SCOTT BRAMAN and OLIVER FRANCIS BRAMAN should be told to return to their father's house and that if REBECCA picked them up from McDonald's ZAMBORNEY would notify law enforcement and see about kidnapping charges.

45.    Despite these threats, REBECCA'S motherly instincts took over and she picked TYLER and OLIVER up from McDonald's and took them back to Saginaw.

46.    The next day, **August 2, 2007**, TYLER SCOTT BRAMAN and OLIVER FRANCIS BRAMAN told Saginaw CPS that OLIVER WAYNE BRAMAN was using a "cattle prod" on them for the past two years and that he punches them in the stomach.

47.    OLIVER WAYNE BRAMAN did not deny the abuse and after a brief police investigation, the Montcalm Prosecutor charged him with several counts of child abuse.

48.    Saginaw CPS, including Defendants SOMMERS and DIETRICH, noted that TYLER SCOTT BRAMAN and OLIVER FRANCIS BRAMAN were now safe with their mother, but that there was still "some concern" that NICHOLAS DANIEL BRAMAN was still living with OLIVER WAYNE BRAMAN. This grave concern was

echoed by TYLER SCOTT BRAMAN and OLIVER WAYNE BRAMAN who told Saginaw CPS that they were afraid for NICHOLAS DANIEL BRAMANS' safety with his father and that the only thing that kept them from running away earlier was that they did not want to leave the younger NICHOLAS DANIEL BRAMAN behind.

49.    On **August 27, 2007** Saginaw CPS, including Defendants SOMMERS and DIETRICH, concluded their investigation and found that there was a preponderance of evidence that OLIVER WAYNE BRAMAN abused/neglected TYLER SCOTT BRAMAN and OLIVER FRANCIS BRAMAN. Saginaw CPS records indicate that they had no idea of the risk of harm to NICHOLAS who was still living with OLIVER BRAMAN SR. Saginaw CPS records indicate that they transferred the case to Montcalm CPS to investigate abuse/neglect of NICHOLAS DANIEL BRAMAN.

50.    On **September 10, 2007** Montcalm CPS, including Defendants TYLER and LOVELACE talked to REBECCA who told them she wanted to get NICHOLAS DANIEL BRAMAN out of OLIVER WAYNE BRAMAN's home.

51.    On **September 10, 2007,** Montcalm CPS, including Defendants TYLER and LOVELACE, refused to provide REBECCA with copies of CPS complaints regarding OLIVER WAYNE BRAMAN that she may have used to convince other officials to remove NICHOLAS DANIEL BRAMAN from the home as it was obvious Montcalm was not going to do so.

52.    On **September 14, 2007,** Defendant TYLER confirmed in an email that there was no investigation "going on here" and that was evidently this was proper as Saginaw CPS "did not seek removal."

53.     On **September 14, 2007**, Montcalm Prosecutor, MISTY DAVIS, informed Montcalm CPS, including defendants TYLER and LOVELACE that "*An investigation should definitely be commenced and either a change of custody should be started or a petition filed for removal. Oliver literally 'shocked' his older boys with a cattle prod repeatedly. As you know abuse to one child is abuse to all. In my opinion, there is no justification for the youngest boy to remain in the care of this man.*"

54.     On **September 24, 2007** Montcalm CPS was advised that OLIVER WAYNE BRAMAN had pled guilty to child abuse charges and that sentencing would be in approximately six weeks. Still, Montcalm CPS did nothing.

55.     On **October 12, 2007** REBECCA begged Defendant LOVELACE to have NICHOLAS DANIEL BRAMAN removed, but he told her the criminal case is separate for CPS and that CPS would not be "filing a petition for jurisdiction, let alone removal." In fact, LOVELACE compared the use of the cattle prod with a child sticking a screwdriver into an electrical socket. LOVELACE, further told REBECCA that the abuse charges as LOVELACE thought OLIVER WAYNE BRAMAN would be found not guilty at trial.

56.     Not unexpectedly, on **October 5, 2007** OLIVER WAYNE BRAMAN failed to appear for a sentencing hearing.

57.     On **October 16, 2007**, police arrived at OLIVER WAYNE BRAMAN's home to find that OLIVER WAYNE BRAMAN, his new wife NANCY and NICHOLAS DANIEL BRAMAN all dead. Investigation revealed that NICHOLAS DANIEL BRAMAN was drugged and afterwards OLIVER WAYNE BRAMAN attached the exhaust from a truck to the dryer vent to flood the sealed room with carbon monoxide.

58.     On October 17, 2007, an autopsy was performed which listed the cause of

death for NICHOLAS DANIEL BRAMAN as "asphyxia secondary to carbon monoxide

poisoning."

59.     The above noted failures by MDHS/CPS were also investigated by the

State of Michigan Office of Children's Ombudsman who found violations of a number of

statutory and administrative requirements, including:

**OCO Finding 1:**
The OCO finds that the Montcalm County CPS did not investigate the 6/20/06 Complaint
in accordance with policy requirements.  Among the allegations, CPS documented being
told Mr. Braman sexually molested a neighbor when she was a child and *"punishes kids
with cow prodder [sic]... Oliver told friend Ryan Evans"*.

**OCO Finding 2:**
In response to the 8/2/07 Complaint, the OCO finds that the Saginaw County CPS error
by not determining that Tyler and Oliver were the victims of torture by Mr. Braman, and
in doing so, failed to apply section 18 of the Child Protection Law requiring the
department to file a petition with a request for termination of Mr. Braman's parental
rights.

**OCO Finding 3:**
After confirming abuse by Mr. Braman in two separate cases (2/4/04, 8/2/07), the OCO
finds that Saginaw County CPS failed to implement sufficient protecting intervention to
ensure child safety.    In 2004, CPS closed a category 2 case contrary to MCL
722.628d(1)(d) and CFP 714-1, which required it be kept open and services provided.
In both cases, CPS determined that the children were *"safe with services"* based on the
fact that the children were temporarily in the care of the protecting parent and the belief
that the protecting parent would seek and obtain a change of custody order through
Friend of the Court.  In fact, the children's continued safety depended on the *"potential
actions"* of two other entities:    the protecting parent and the FOC, both out of CPS
control.    Until a Court order to change custody was obtained, CPS was unable to
conclude that the children were *"safe with services"*.

**OCO Finding 4:**
The OCO finds that after becoming aware of the evidence that Saginaw County CPS and
law enforcement obtained concerning the abuse of Tyler and Oliver, Montcalm County
CPS failed to take sufficient action to protect Nicholas.

Regardless of the actions and decisions that Saginaw County CPS took concerning Tyler
and Oliver or the status of the case at the time Saginaw County CPS transferred it to
Montcalm, at the earliest point it became aware of Mr. Braman's egregious acts of abuse,

Montcalm County CPS should have filed a petition seeking removal of Nicholas from his father. Based upon the evidence obtained by Saginaw County CPS and law enforcement (and known by Montcalm CPS as early as 8/21/07), Montcalm County CPS had reasonable grounds to believe that Nicholas was unsafe in his father's care.

60.     Concerns with MDHS/CPS capabilities have been raised over the past

eight years including:

a.  **In the 2002 federal Child and Family Services Review ("CFSR") for Michigan conducted by the U.S. Department of Health and Human Services' Administration for Children and Families ("ACF"), failed to meet any of the seven performance outcome measures used to gauge the agency's ability to meet the safety, permanency, and well-being needs of children in its custody.** These measures contain two safety outcomes, **including "Children are, first and foremost, protected from abuse and neglect"** and "Children are safely maintained in their homes whenever possible and appropriate," as well as two permanency and three well-being outcomes. Results of the federal review revealed that MDHS was not providing for the educational or mental health needs of children, was not providing stable foster care placements, and was not timely and appropriately identifying case plans for children.

b.  In 2003, Joshua Causey, a four-year-old child in foster care, was beaten to death by his foster parent in a Wayne County foster home, leading to criminal charges against his foster care workers. Following the August 8, 2006 filing of the *Dwayne B. v. Granholm* lawsuit, at least three more children in state foster care have died at the hands of their state approved caretakers. **The 2006 Annual Report of the Michigan Foster Care Review Board ("FCRB") asserted that MDHS's inadequate workforce was "a substantial factor in the abuse and death of children in the foster care system during the past year ...."**

c.  **Michigan's Office of the Children's Ombudsman ("OCO") reported in the 2003-2004 Children's Ombudsman Annual Report** that MDHS was frequently failing to find permanent homes for children, to keep siblings together when they had to be removed from their family homes, and **to provide needed services to children. The 2004-2005 OCO Annual Report found that these systematic inadequacies continued to plague MDHS. In its 2005-2006 Annual Report, the Office of the Children's Ombudsman continued to cite these significant systematic failings within MDHS,** including unacceptable practices and policy development in the areas of adoption, licensing, child protective services, private child placing agency oversight and the matching and placement of children in suitable foster family homes.

d.  The August 2005 State Audit Report by the Office of the State Auditor General in relation to the MDHS foster care program found that MDHS (1) **"did not comply with material provisions of state laws and regulations related to the delivery**

TELEPHONE (248) 355-5555 · FAX (248) 355-5148

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463

of Program services," (2) "was not effective and efficient in monitoring the delivery of services by Program contracted service providers," and (3) "was not effective in meeting its outcome goals." (Emphasis added).

61.     The deficiencies MDHS/CPS are generalized and systemic and in the case of NICHOLAS DANIEL BRAMAN the particular deficiencies of Saginaw and Montcalm were disastrous.

62.     The death of NICHOLAS DANIEL BRAMAN, would have been avoided if Defendants had simply done what they were obligated to do by law to protect the Plaintiff from further abuse and neglect, and to otherwise ensure his health, safety and welfare pursuant to procedural and substantive process, equal protection, and federal law under Public Law 105-89, Public Law 108-36, 42 USC ss 1320a-10, and 42 USC ss 5106a.

## COUNT I

### GROSS NEGLIGENCE AGAINST DEFENDANTS
### TYLER, SOMMERS, LOVELACE AND DIETRICH

63.     The Plaintiff, hereby adopts and incorporates by reference the allegations set forth in paragraphs 1-62 as if set forth here, paragraph by paragraph.

64.     MCHS employs child welfare investigators to investigate child abuse and neglect reports. The stated purposes of these investigations are 1) to determine whether a preponderance of evidence indicates that child maltreatment has occurred, (MCL 722.628 d), 2) to assess the risk to involved children to determine, among other things, whether a substantiated abuse/neglect report should be placed on the Michigan Central Registry (MDHS Children's Protective Services manual CFP 711-4), and 3) to determine whether children are in a situations so dangerous that they can only be protected by placement in MDHS custody or replacement in a different foster home.

65.    The purpose of CPS is to assure that children are protected from further physical or emotional harm caused by a parent or other adult responsible for the child's health and welfare.

66.    MDHS/CPS staff is legally required to intervene to safeguard the rights and welfare of children whose families are unable or unwilling to do so.

67.    The Defendants' acts and omissions were grossly negligent and they utterly failed to follow the clearly applicable law and allowed NICHOLAS DANIEL BRAMAN to be abused, neglected and killed.

68.    Defendants SOMMERS, TYLER, LOVELACE and DIETRICH were grossly negligent and failed to properly investigate the complaints of abuse and failed to follow the mandates of the clearly established law, including, MCL 722.683 of the Child Protection Act which required MDHS/CPS to submit a petition to the court if MDHS/CPS determines that the parent has abused the child or a sibling of a child and the abuse included among other things "battering, torture, or other severe physical abuse."

69.    This procedural framework in MCL 722.683 is specifically intended to protect children such as NICHOLAS DANIEL BRAMAN and as noted by the OCO this procedural statute should have been followed by Montcalm and Saginaw County CPS. The failure to follow this statute was grossly negligent and illustrative of Defendants' deliberate indifference to NICHOLAS DANIEL BRAMAN.

70.    As a matter of official custom and policy, Saginaw and Montcalm County CPS investigative employers did not abide by the investigative or procedural requirements of the Michigan Child Protection Act, or their own administrative policies under CFP 711-1, et. seq.

71.    MCHS/CPS administrators have acknowledged severe failings within the agency in being able to meet the above mandatory legal obligations, yet have done too little, and in some cases nothing at all, to change the court of this deteriorating system.

72.    The Defendants were each recklessly and otherwise deliberately indifferent to the safety and welfare needs of the children they were otherwise constitutionally obligated to protect by statute and administrative rule, including NICHOLAS DANIEL BRAMAN.

73.    This situation of recklessness and deliberate indifference was in place for so long that it was Saginaw and Montcalm County MDHS/CPS custom, policy or practice from at least September 2002 to the present.

74.    The Saginaw and Montcalm County MCHS/CPS supervisors (LOVELACE and DIETRICH) were well aware of the MCHS/CPS workers long term willful and deliberate refusal to comply with the mandatory investigative requirements of the Child Protection Act, and their long term manifest refusal to do their job (as set forth above) and (in bad faith) did nothing to correct the situation.

75.    The death of NICHOLAS DANIEL BRAMAN, would have been avoided if Defendants had simply done what they were obligated to do by law to protect the NICHOLAS DANIEL BRAMAN from further abuse and neglect, and to otherwise ensure his health, safety and welfare pursuant to procedural and substantive due process, equal protection, and federal law under Public Law 105-89, Public Law 108-36, 42 USC ss 1320a-10, and 42 USC ss 5106a.

76.    The Defendants acted recklessly and with deliberate indifference by refusing to correct this well known custom, policy or practice; and by failing to otherwise

enforce and/or follow the specific terms and obligations of the Child Protection Act, including the proper implementation of the Child Abuse and Neglect investigative and petition obligations, in violation of the Plaintiff's federal statutory and constitutional rights.

77.     As a direct and proximate result of the individual Defendants breach of their clear legal duty to Plaintiff, including their duty to enforce the specific terms of the Michigan Child Protection Act, NICHOLAS DANIEL BRAMAN, his estate, and/or his statutory beneficiaries suffered:

      a.  Conscious pain and suffering;

      b.  Emotional distress, mental anguish, fright, shock and humiliation;

      c.  Physical injury, with physical pain and suffering;

      d.  Loss of society and companionship;

      e.  Economic loss;

      f.  Punitive damages; and

      g.  Attorney fees.

## COUNT II

### 42 USC §1983 AS AGAINST DEFENDANTS SOMMERS, TYLER, DIETRICH, LOVELACE, UDOW, CHAMPAGNE AND FORREST AS A JOINT PARTICIPANT IN THE VIOLATION OF THE PLAINTIFF'S FEDERAL STATUTORY AND CONSTITUTIONAL RIGHTS

78.     The Plaintiff, hereby adopts and incorporates by reference the allegations set forth in paragraphs 1-77 as if set forth here, paragraph by paragraph.

79.     MCHS employs child welfare investigators to investigate child abuse and neglect reports. The stated purposes of these investigations are 1) to determine whether a preponderance of evidence indicates that child maltreatment has occurred, (MCL 722.628

d), 2) to assess the risk to involved children to determine, among other things, whether a substantiated abuse/neglect report should be placed on the Michigan Central Registry (MDHS Children's Protective Services manual CFP 711-4), and 3) to determine whether children are in a situations so dangerous that they can only be protected by placement in MDHS custody or replacement in a different foster home.

80.    The purpose of CPS is to assure that children are protected from further physical or emotional harm caused by a parent or other adult responsible for the child's health and welfare.

81.    MDHS/CPS staff is legally required to intervene to safeguard the rights and welfare of children whose families are unable or unwilling to do so.

82.    The Defendants utterly failed to follow the clearly applicable law and allowed NICHOLAS DANIEL BRAMAN to be abused, neglected and killed.

83.    Defendants SOMMERS, TYLER, LOVELACE and DIETRICH failed to properly investigate the complaints of abuse and failed to follow the mandates of the clearly established law, including, MCL 722.683 of the Child Protection Act which required MDHS/CPS to submit a petition to the court if MDHS/CPS determines that the parent the parent has abused the child or a sibling of a child and the abuse included among other things "battering, torture, or other severe physical abuse."

84.    This procedural framework in MCL 722.683 is specifically intended to protect children such as NICHOLAS DANIEL BRAMAN and as noted by the OCO this procedural statute should have been utilized by Montcalm and Saginaw County CPS.

85.    In addition, the above Michigan Department of Human Services statutory and administrative requirements were not enforced by the Michigan Department of

Human Services CPS supervisory personnel for years.

86.     As a matter of official custom and policy, Saginaw and Montcalm County CPS investigative employers did not abide by the investigative or procedural requirements of the Michigan Child Protection Act, or their own administrative policies under CFP 711-1, et. seq.

87.     MCHS/CPS administrators have acknowledged severe failings within the agency in being able to meet the above mandatory legal obligations, yet have done too little, and in some cases nothing at all, to change the court of this deteriorating system.

88.     The Defendants were each recklessly and otherwise deliberately indifferent to the safety and welfare needs of the children they were otherwise constitutionally obligated to protect by statute and administrative rule, including NICHOLAS DANIEL BRAMAN.

89.     This situation of recklessness and deliberate indifference was in place for so long that it was Saginaw and Montcalm County MDHS/CPS custom, policy or practice from at least September 2002 to the present.

90.     The Saginaw and Montcalm County MCHS/CPS supervisors (LOVELACE and DIETRICH) were well aware of the MCHS/CPS workers long term willful and deliberate refusal to comply with the mandatory investigative requirements of the Child Protection Act, and their long term manifest refusal to do their job (as set forth above) and (in bad faith) did nothing to correct the situation.

91.     The State of Michigan MDHS/CPS administrative staff, including MARIANNE UDOW, LAURA CHAMPAGNE, and TED FORREST, were also well aware of this Saginaw and Montcalm County MCHS/CPS custom, policy and practice,

g.  Attorney fees.

## COUNT III

### NEGLIGENCE AS TO DFEFENDANTS CHAD CAMPBELL AND COMMUNITY HOPE CHRISTIAN COUNSELING AND MENTAL HEALTH CENTER

95.  Plaintiff hereby adopts and incorporates by reference paragraphs 1-94 as if set forth here, paragraph by paragraph.

96.  Defendant CHAD CAMPBELL is a licensed social worker in the state of Michigan and is the Director of Defendant COMMUNITY HOPE CHRISTIAN COUNSELING AND MENTAL HEALTH CENTER.

97.  These Defendants counseled OLIVER WAYNE BRAMAN and NICHOLAS DANIEL BRAMAN since at least 2005. More recently, in October 2007 these Defendants began counseling OLIVER WAYNE BRAMAN and NICHOLAS DANIEL BRAMAN after OLIVER WAYNE BRAMAN was arrested for torturing and abusing NICHOLAS DANIEL BRAMANS' brothers with a cattle prod.

98.  Before OLIVER WAYNE BRAMAN killed himself and NICHOLAS DANIEL BRAMAN he wrote a suicide note that stated "Game Over Chad Campbell can explain... ."

99.  Defendants CHAD CAMPBELL and COMMUNITY HOPE CHRISTIAN COUNSELING AND MENTAL HEALTH CENTER knew OLIVER WAYNE BRAMAN planned to kill himself and NICHOLAS DANIEL BRAMAN and did nothing to protect NICHOLAS DANIEL BRAMAN.

100.  Defendants conduct was in direct violation under Michigan law for failure to report suspected abuse and neglect under MCL 722.623.

101.   As a direct and proximate result of the individual Defendants breach of their clear legal duty to Plaintiff, including their duty to enforce the specific terms of the Michigan Child Protection Act, NICHOLAS DANIEL BRAMAN, his estate, and/or his statutory beneficiaries suffered:

      a.   Conscious pain and suffering;

      b.   Emotional distress, mental anguish, fright, shock and humiliation;

      c.   Physical injury, with physical pain and suffering;

      d.   Loss of society and companionship;

      e.   Economic loss;

      f.   Punitive damages; and

      g.   Attorney fees.

**WHEREFORE**, Plaintiffs pray that this Court would enter a Judgment in this matter in favor of Plaintiffs and against Defendants, in whatever amount the jury finds just and reasonable, in excess of Seventy Five Thousand ($75,000.00) dollars, plus interest, costs and attorney fees.

Respectfully submitted,

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C.

By: _____

GEOFFREY N. FIEGER (P30441)
VERNON R. JOHNSON (P39219)
GREGORY W. WIX (P65424)
g.wix@fiegerlaw.com
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI  48075
(248) 355-5555

DATED: 4/28, 2010

## JURY DEMAND

Plaintiff, REBECCA JASINSKI, as the Personal Representative of the Estate of

NICHOLAS DANIEL BRAMAN, deceased, by their attorneys FIEGER, FIEGER,

KENNEY, JOHNSON & GIROUX, P.C. and hereby demand a Trial by Jury in the

aforementioned cause of action.

Respectfully submitted,

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C.

By: _____

GEOFFREY N. FIEGER (P30441)
VERNON R. JOHNSON (P39219)
GREGORY W. WIX (P65424)
g.wix@fiegerlaw.com
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

DATED: 4/28, 2010