*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

REBECCA JASINSKI, as the Personal
Representative of the Estate of Nicholas
Daniel Braman, deceased,
*Plaintiff-Appellee,*

No. 10-2571

*v.*

SHERI TYLER, JAMIE LOVELACE, MARY
SOMMERS, RHODA DIETRICH, MARIANNA
UDOW, LAURA CHAMPAGNE, and TED
FORREST, jointly and severally,
*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:10-cv-636—Robert J. Jonker, District Judge.

Argued: May 30, 2012

Decided and Filed:  September 3, 2013

Before:  GILMAN and WHITE, Circuit Judges.[*]

————————

#### COUNSEL

**ARGUED:** Mark E. Donnelly, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, for Appellants.  Heather A. Glazer, FIEGER, FIEGER,
KENNEY & GIROUX, P.C., Southfield, Michigan, for Appellee.  **ON BRIEF:** Mark
E. Donnelly, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing,
Michigan, for Appellants.   Heather A. Glazer, FIEGER, FIEGER, KENNEY &
GIROUX, P.C., Southfield, Michigan, for Appellee.

WHITE, J., delivered the opinion of the court, in which MARTIN, J., joined.
GILMAN, J. concurred in the judgment only.

———————

[*] The Honorable Boyce F. Martin, Jr., who was a member of the panel rendering a decision in this
appeal, retired on August 16, 2013.

1

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge.  Defendants-Appellants, officials and employees of Michigan Child Protective Services ("CPS") and its parent-agency, the Michigan Department of Human Services ("MDHS"), appeal the district court's denial of their motion seeking dismissal based on public-employee immunity or qualified immunity of Plaintiff-Appellee Rebecca Jasinski's federal substantive and procedural due process claims and state-law gross-negligence claim arising from the murder of her son, Nicholas Braman ("Nicholas"), by his father, Oliver Wayne Braman ("Oliver").  We **REVERSE**.

## I. Background

Jasinski filed this action in Montcalm County Circuit Court against Montcalm County CPS employees Sheri Tyler and Jamie Lovelace, Saginaw County CPS employees Mary Sommers and Rhoda Dietrich, former MDHS Director Marianna Udow, former MDHS Chief Deputy Director Laura Champagne, former Manager of the Michigan CPS Program Ted Forrest, the Community Hope Christian Counseling and Mental Health Center ("CHCCMHC"), and its Director Chad Campbell.  Jasinski alleged gross negligence against Sheri Tyler, Sommers, Lovelace, and Dietrich (Count I); violations of various federal statutory and constitutional rights under 42 U.S.C. § 1983, including procedural and substantive due process violations, an equal protection violation, violation of the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 (AAA), 42 U.S.C. § 670 *et seq*, and violation of the Child Abuse Prevention and Treatment Act (CAPTA), 42 U.S.C. § 5106, against all Defendants (Count II); and a negligence claim against Campbell and CHCCMHC (Count III).

Defendants removed the case to federal court based on federal-question jurisdiction over the federal claims and supplemental jurisdiction over the state-law

claims. The district court exercised supplemental jurisdiction over the gross negligence claims against Defendants but remanded the claims against Campbell and CHCCMHC to the Montcalm County Circuit Court.

## A. The Complaint

The complaint alleges that over the course of nine years, CPS received numerous complaints regarding Oliver's abuse and neglect of Nicholas and his siblings, Oliver Francis Braman ("Oliver Francis"), Tyler Braman ("Tyler"), and Rachel Jasinski:

August 26, 1998: A CPS complaint alleged that Oliver was verbally and physically abusive to the children and struck one of the children so hard that all the blood vessels in the child's nose ruptured. CPS denied the complaint.

February 1999: A CPS complaint alleged that Oliver was mentally cruel and that the children were living in poor living conditions. CPS denied the complaint.

April 1999: CPS received a complaint regarding the children's living conditions, alleging septic issues and broken glass in the play areas. CPS denied the complaint.

June 2000: A CPS complaint alleged that Oliver threatened to kill Nicholas and that Nicholas was afraid of his father. The complaint also alleged that Oliver and his live-in girlfriend had pulled the children's teeth out before they were ready to come out naturally. CPS denied the complaint.

April 2002: A CPS complaint alleged that Oliver was withholding medication from his children and was making Nicholas take baths with his live-in girlfriend and grab her breast. CPS denied the complaint.

February 2004: A CPS complaint alleged that Oliver assaulted his son Oliver Francis by throwing him off the porch and kicking him because he could not find his glasses. Oliver also believed Oliver Francis was afraid of the dark, so Oliver dropped Oliver Francis off miles away from home at night and left him to find his way home. Afterwards, Oliver did the same with his son Tyler. As a result of this complaint, CPS also discovered that the children were required to compare their pubic hair. In

interviews, Oliver Francis and Tyler told CPS of beatings they received on their bare buttocks and of pliers being used on their fingers. The complaint alleges that CPS opened a case for documentation purposes but closed the case without further action.

February 2004: Jasinski reported to CPS that she attended a Personal Protection Order ("PPO") hearing regarding Oliver and informed CPS that Oliver Francis and Tyler attended the hearing with her but were so afraid of their father that they hid under the benches.

June 2006: Oliver was reported to CPS for allegations of child molestation of a neighbor. The investigation uncovered that Oliver "punishes [his] kids with a cow prodder [sic]." CPS denied that the children were being abused or neglected, and according to the Office of the Children's Ombudsman, failed to "investigate, collect evidence, or reach a disposition on the allegation that Mr. Braman used a cattle prod on his children." (Compl. at ¶ 42.)

The complaint alleges the following with respect to the events leading up to Nicholas's death in October 2007:

On August 1, 2007, Tyler and Oliver Francis called their mother and informed her they could no longer take Oliver's abuse and were planning to run away. At the time, all the children lived with Oliver in Montcalm County. Jasinski, who lived in Saginaw County, called the CPS office in Saginaw to report that Tyler and Oliver Francis were planning to run away due to abuse and that they intended to hide in a McDonald's parking lot and wait for her to pick them up. Saginaw CPS employee Kevin Zamborney spoke with Jasinski and noted in his records that she had made several complaints that were not investigated. Zamborney informed Jasinski that Tyler and Oliver Francis should be told to return to their father's house and that if she picked them up he would notify law enforcement and see about kidnapping charges. Jasinski picked up the children from McDonalds nevertheless and brought them back to Saginaw.

The following day, Tyler and Oliver Francis told Saginaw CPS that Oliver had been using a cattle prod on them for the previous two years and that he punches them in

the stomach.  When interviewed, Oliver admitted using the cattle prod and after a brief police investigation the Montcalm County Prosecutor charged him with several counts of child abuse.

Saginaw CPS, including Defendants Sommers and Dietrich, noted that Tyler and Oliver Francis were now safe with their mother, but that there remained "some concern" that their younger brother Nicholas was still living with Oliver.  Tyler and Oliver Francis told Saginaw CPS that they were afraid for Nicolas's safety and did not run away earlier because they did not want to leave Nicholas behind.

On August 27, 2007, Saginaw CPS, including Sommers and Dietrich, concluded their investigation and found that there was a preponderance of evidence that Oliver abused/neglected Oliver Francis and Tyler.  Saginaw CPS records state that it is undetermined whether there was any risk of harm to Nicholas, who was still living with Oliver, and that the case was transferred to Montcalm CPS to investigate abuse/neglect of Nicholas.

On September 10, Montcalm CPS, including Defendants Sheri Tyler and Lovelace, spoke with Jasinski, who told them she wanted to get Nicholas out of Oliver's home.  Montcalm CPS did not remove Nicholas from Oliver's home and refused to provide Jasinski with copies of previously-filed CPS complaints that she hoped to use to convince other officials to remove Nicholas from Oliver's home.

On September 14, Sheri Tyler of Montcalm CPS confirmed in an email that no investigation was "going on here" as Saginaw CPS "did not seek removal."  (Compl. at ¶ 52.)  In response, Montcalm Prosecutor Misty Davis informed Montcalm CPS that:

> An investigation should definitely be commenced and either a change of custody should be started or a petition filed for removal.  Oliver literally 'shocked' his older boys with a cattle prod repeatedly.  As you know abuse to one child is abuse to all.  In my opinion, there is no justification for the youngest boy to remain in the care of this man.

(*Id.* at ¶ 53.)

On September 24, Montcalm CPS learned that Oliver had pleaded guilty to child abuse charges and that sentencing would be in approximately six weeks.  On October 5, Oliver failed to appear for a sentencing hearing.  On October 12, Jasinski begged Lovelace to have Nicholas removed, but he told her that the criminal case was a separate matter from CPS and that CPS would not be "filing a petition for jurisdiction, let alone removal."  (*Id.* at ¶ 55.)  In that conversation, Lovelace compared the use of a cattle prod on a child with a child sticking a screwdriver into an electrical socket and told Jasinski that Oliver would probably be acquitted if he went to trial.

On October 16, 2007, police discovered Nicholas's body at Oliver's home, along with Oliver's body and the body of Oliver's wife Nancy.  Investigation revealed that Nicholas had been drugged and that Oliver had attached the exhaust from a truck to the dryer vent to flood a sealed room with carbon monoxide.  An autopsy of Nicholas established the cause of death as "asphyxia secondary to carbon monoxide poisoning."

The complaint further alleges that the Michigan Office of Children's Ombudsman ("OCO") investigated the actions of MDHS/CPS and found violations, including:

> OCO Finding 1:  The OCO finds that the Montcalm County CPS did not investigate the 6/20/06 Complaint in accordance with policy requirements.  Among the allegations, CPS documented being told Mr. Braman sexually molested a neighbor when she was a child and "*punishes kids with cow prodder [sic] . . . Oliver [Francis] told friend Ryan Evans*".

> OCO Finding 2:  In response to the 8/2/07 Complaint, the OCO finds that the Saginaw County CPS error [sic] by not determining that Tyler and Oliver [Francis] were the victims of torture by Mr. Braman, and in doing so, failed to apply section 18 of the Child Protection Law requiring the department to file a petition with a request for termination of Mr. Braman's parental rights.

> OCO Finding 3:  After confirming abuse by Mr. Braman in two separate cases (2/4/04, 8/2/07), the OCO finds that Saginaw County CPS failed to implement sufficient protecting intervention to ensure child safety.  In 2004, CPS closed a category 2 case contrary to MCL 722.628d(1)(d) and CFP 714-1, which required it be kept open and services provided.

In both cases, CPS determined that the children were "*safe with services*" based on the fact that the children were temporarily in the care of the protecting parent and the belief that the protecting parent would seek and obtain a change of custody order through Friend of the Court.  In fact, the children's continued safety depended on the "*potential actions*" of two other entities:  the protecting parent and the FOC, both out of CPS control.  Until a Court order to change custody was obtained, CPS was unable to conclude that the children were "*safe with services*".

OCO Finding 4:  The OCO finds that after becoming aware of the evidence that Saginaw County CPS and law enforcement obtained concerning the abuse of Tyler and Oliver [Francis], Montcalm County CPS failed to take sufficient action to protect Nicholas.

Regardless of the actions and decisions that Saginaw County CPS took concerning Tyler and Oliver [Francis] or the status of the case at the time Saginaw County CPS transferred it to Montcalm, at the earliest point it became aware of Mr. Braman's egregious acts of abuse, Montcalm County CPS should have filed a petition seeking removal of Nicholas from his father.  Based upon the evidence obtained by Saginaw County CPS and law enforcement (and known by Montcalm CPS as early as 8/21/07), Montcalm County CPS had reasonable grounds to believe that Nicholas was unsafe in his father's care.

(Compl. at ¶ 59.)

The complaint includes three counts.  Count I is captioned "Gross Negligence Against Defendants [Sheri] Tyler, Sommers, Lovelace and Dietrich," and alleges Sheri Tyler, Sommers, Lovelace, and Dietrich failed to properly investigate the complaints of abuse under the Michigan Child Protection Law, Mich. Comp. Laws § 722.628.  The complaint alleges further that Defendants failed to follow another section of the Michigan Child Protection Law, Mich. Comp. Laws § 722.638,[1] "which require[s] MDHS/CPS officials to submit a petition to this court if MDHS/CPS determines that the parents has abused the child of a sibling of a child and the abuse included 'battering, torture, or other severe physical abuse.'"  The complaint contends that failure to follow these procedures constituted "gross negligence"; that Defendants were reckless and deliberate indifferent to Nicholas's safety and welfare; and that Defendants' breach of

---

[1]The complaint erroneously refers to "MCL 722.683," which does not exist.  The requirement that CPS officials file a petition with the court if there is a finding of "battering, torture, or other severe abuse" is found under Mich. Comp. Laws § 722.638.

their legal duties were the direct and proximate cause of harm to Nicholas and his estate.
Finally, Count I asserts that Nicholas's death "would have been avoided if Defendants
had simply done what they were obligated to do by law to protect [Nicholas] from
further abuse and neglect, and to otherwise ensure his health and safety and welfare
pursuant to procedural and substantive due process, equal protection, and federal law
under [the AAA and CAPTA]."**2**

Count II is captioned "42 USC [sic] § 1983 as Against Defendants Sommers,
[Sheri] Tyler, Dietrich, Lovelace, Udow, Champagne and Forrest as a Joint Participant
in the Violation of the Plaintiff's Federal Statutory and Constitutional Rights," and
reiterates that the CPS staff is legally required to investigate and intervene to safeguard
the rights and welfare of children under Michigan law and CPS procedures.  Count II
further contends that the MDHS' statutory and administrative requirements were not
enforced by the MDHS/CPS supervisory personnel and that, as a matter of official
custom and policy, Saginaw and Montcalm County CPS investigative employers did not
abide by the investigative or procedural requirements of § 722.638 or their own
administrative policies.

Count III alleges negligence as to Defendants Campbell and CHCCMHC,
asserting that Campbell had knowledge that Oliver was going to kill himself and
Nicholas and violated Michigan law by failing to report suspected abuse and neglect
under § 722.623.  The district court declined to exercise jurisdiction over this claim and
remanded it to state court.

Defendants filed a motion to dismiss or, alternatively, for judgment on the
pleadings, arguing, *inter alia*, that (1) Jasinski failed to state a substantive due process
claim because Nicholas was never in the custody of the State and no state actor acted
affirmatively to increase the risk of harm to him; (2) Jasinski failed to state a procedural
due process claim because the Michigan Child Protection Law does not mandate
compliance with specific procedures and does not create a legitimate claim of

---

**2**At the motion to dismiss hearing, Jasinski voluntarily dismissed her equal protection, AAA, and
CAPTA claims.

entitlement; (3) Defendants are entitled to qualified immunity; and (4) Jasinski's gross negligence claim is barred by public employee immunity under Michigan law, Mich. Comp. Laws § 691.1407.  After a hearing, the district court denied the motion to dismiss without prejudice.  Defendants timely appealed.

## II.  Jurisdiction

We have jurisdiction to consider this interlocutory appeal because a "district court's denial of a claim of qualified immunity, to the extent it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291."  *Whitney v. City of Milan*, 677 F.3d 292, 295–96 (6th Cir. 2012).[3]

This Court reviews de novo a district court's decision on a motion for judgment on the pleadings as well as a motion to dismiss under Rule 12(b)(6).  *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).  To survive a motion to dismiss, a plaintiff must allege facts that, if accepted as true, are sufficient to "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing a motion to dismiss, we "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  Dismissal based on qualified immunity is appropriate if the complaint fails to allege the violation of a constitutional right that is clearly established.  *Hardy v. Jefferson Comm. Coll.*, 260 F.3d 671, 677 (6th Cir. 2001).

## III.  Substantive Due Process

Defendants argue that Jasinski fails to state a substantive due process claim because Nicholas was never in state custody and Defendants did not act affirmatively

---

[3]We treat the district court's order denying the motion to dismiss "in all . . . respects" as a denial of qualified immunity where Defendants asserted qualified immunity as a grounds for dismissal.

to increase the risk of harm to him. Defendants further argue that, even if Jasinski sufficiently pled a substantive due process claim, they are entitled to qualified immunity because reasonable officials would not have believed that their conduct was unlawful based on clearly established law.

As a general rule, the Due Process Clauses of the Fifth and Fourteenth Amendments "confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 196 (1989). The Due Process Clause's purpose is "to protect the people from the State, not to ensure that the State protects them from each other." *Id.* In *DeShaney*, Joshua, a young child who was beaten and permanently injured by his father, brought a due process claim against county officials for failing to remove him from his father's custody after they had reason to believe he was being abused. *Id.* at 192–94. The Supreme Court refused to hold the County liable under the Due Process Clause, noting that, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*" *Id.* at 201 (emphasis added).

This statement from *DeShaney* has led every Circuit Court of Appeals, including this one, to recognize an exception to *DeShaney* for "state-created dangers." *See e.g., Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *see also Butera v. District of Columbia*, 235 F.3d 637, 648–49 (D.C. Cir. 2001) ("All circuit courts of appeals . . . have by now relied on this passage in *DeShaney* to acknowledge that there may be possible constitutional liability . . . where the state creates a dangerous situation or renders citizens more vulnerable to danger") (internal quotation marks omitted). Thus, "a plaintiff may bring a substantive due process claim by establishing (1) an affirmative act by the State that either created or increased the risk that the plaintiff would be exposed to private acts of violence; (2) a special danger to the plaintiff created by state action, as distinguished from a risk that affects the public at large; and (3) the requisite state culpability to establish a substantive due process violation." *Schroder v.*

*City of Fort Thomas*, 412 F.3d 724, 728 (6th Cir. 2005) (internal quotation marks and alterations omitted).

In determining whether an affirmative state act increased the risk of harm to an individual, the question is whether the individual "was safer *before* the state action than . . . *after* it." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (police did not create or increase risk of harm when they offered to transport individual from a place of greater danger (the shoulder of a two-lane highway) and then released him in a place of lesser danger (a parking lot in a high-traffic area) after he refused to consent to a search); *see DeShaney*, 489 U.S. at 201 (state's temporary custody of a child before returning him to his dangerous father did not increase the child's risk of harm because state "placed him in no worse position than that in which he would have been had it not acted at all"); *Schroder*, 412 F.3d at 728–29 (city did not act affirmatively to create or increase risk of harm on city street by ignoring residents' requests to reduce speed limit or by taking down residents' signs indicating drivers should adhere to a lower speed limit).

In *Caldwell v. City of Louisville*, 120 F. App'x 566 (6th Cir. 2004) (unpublished), this court found a state-created danger where, in response to a woman's complaints of domestic abuse, a detective and police officers brought her into the police station, processed paperwork to execute a warrant for her abuser's arrest, and pressured her to seek an emergency protective order. After the warrant had been issued, the woman refused to complete the requisite protective-order paperwork and filed an internal-affairs complaint against the detective, alleging coercion. *Id.* at 568. When a court later issued a second warrant to arrest the abuser, the detective failed to execute it for six days in light of the internal-affairs complaint, and the woman was murdered by her abuser. *Id.* at 569. Noting that the woman was forced by police against her will to go to the station and process paperwork in support of the first warrant, and citing the woman's complaint against the detective as evidence of her unwillingness to seek criminal prosecution, this court concluded that the state "undertook some affirmative conduct which ultimately increased [the woman's] risks of harm." *Id.* at 573.

In contrast, in *Langdon v. Skelding*, No. 11-2353, 2013 WL 1662961 (6th Cir. April 17, 2013), this court found no state-created danger where, after child protective services received multiple child abuse complaints but closed each investigation, a minor died in a house fire after being chained to a bed by her father and stepmother. *Id.* at *1, *3–4. This court rejected the plaintiff's argument that CPS's decision to close the investigations "in the face of such obvious dangers was an affirmative act that amounted to an endorsement of the parents' private acts thereby emboldening them." *Id.* at *4. The court noted that, "[t]he [parents] regularly chained [the minor] to the bed before the CPS investigation and continued doing so afterward," and determined that although the facts alleged showed that CPS did not sufficiently investigate the complaints of abuse, "this is a mere failure to act." *Id.*

In the instant case, the district court found that Jasinski sufficiently alleged that the state acted affirmatively to increase the risk of harm to Nicholas when Saginaw CPS investigated the complaint that Oliver abused Oliver Francis and Tyler, and when the Montcalm prosecutor criminally charged Oliver for that abuse.[4]  Jasinski contends that as a result of both actions, Nicholas was exposed to a greater risk of harm from an increasingly angry Oliver.[5]

Defendants argue that neither the CPS investigation nor the criminal prosecution constituted an affirmative act by the state that increased the risk of harm to Nicholas. They direct this court to evidence contained in various documents pertaining to the CPS investigation, including those submitted by Jasinski in response to Defendants' motion to dismiss, that purport to show that "on balance, the situation at [Oliver]'s home was safer after the State became involved than it was before."  (Defendants' Br. at 18.)

---

[4]We observe that although Jasinski alleged that Defendants had a "special relationship" with Nicholas, she did not plead that the state either created or increased the danger that he would suffer harm. Nevertheless, because Defendants did not challenge this aspect of the pleadings and simply argued that the facts alleged did not support a claim that they created or increased the danger to Nicholas, this deficiency in the pleadings was waived.

[5]Jasinski also argues that Montcalm CPS's refusal to provide Jasinski with previous CPS complaints constituted an affirmative act to thwart Jasinski's attempts to obtain information to convince other agencies to remove Nicholas from danger.  This is Jasinski's least compelling argument for an affirmative state action, and the district court did not address it.

However, given the nature of Defendants' motion, the district court was not obliged to look beyond the complaint.

Assuming arguendo that Jasinski sufficiently alleged a violation of Nicholas's substantive due process rights, we must still address the question of qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This standard requires courts to examine the right asserted "at a relatively high level of specificity, and on a fact-specific, case-by-case basis." *O'Malley v. City of Flint*, 652 F.3d 662, 668 (6th Cir. 2011) (internal quotation marks and alterations omitted). The question is whether "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alterations omitted)).

Under the circumstances presented here, the contours of the substantive due process right to be free from government action increasing the risk of harm was not sufficiently clear under our case law that a reasonable official would understand that the state's actions in pursuing Oliver for use of the cattle prod and then failing to immediately remove Nicholas would violate Nicholas's substantive due process rights. Accordingly, Defendants are therefore entitled to qualified immunity.[6]

## IV.  Procedural Due Process

Defendants also argue that the district court erred in finding that Jasinski pled a valid procedural due process claim based on Defendants' failure to comply with the Michigan Child Protection Law, Mich. Comp. Laws § 722.638.

---

[6]Defendants argue that because none of them made the decision to charge Oliver with child abuse, they cannot be held responsible on account of a state-created danger that they did not create. Neither party cites—nor could we find—any case that squarely addresses whether one state actor can be held liable under a state-created danger theory where another state actor created the danger. However, because we determine that Defendants are entitled to qualified immunity, we need not address this issue.

To establish a procedural due process claim, a plaintiff must show "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the . . . interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). A liberty interest may be created by state law when a state places "substantive limitations on official discretion." *Tony L. and Joey L. v. Childers*, 71 F.3d 1182, 1185 (6th Cir. 1995) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 2490 (1983)). A state may create such limitations by "establishing 'substantive predicates' to govern official decision-making . . . and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)). The state statute "must use 'explicitly mandatory language' requiring a particular outcome if the articulated substantive predicates are present." *Id.* (citing *Thompson*, 490 U.S. at 463).

Here, the Michigan statute provides:

> (1) The department shall submit a petition for authorization by the court under section 2(b) of chapter XIIA of 1939 PA 288, MCL 712A.2 [conferring jurisdiction on the family division of circuit court], if 1 or more of the following apply:
>> (a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:
> . . . .
>>> (iii) Battering, torture, or other severe physical abuse.

Mich. Comp. Laws § 722.638. Subsection (2) of the statute provides that, "In a petition submitted as required by subsection (1), if a parent is a suspected perpetrator . . . the department shall include a request for termination of parental rights at the initial dispositional hearing." *Id.*

Defendants do not dispute that the statute mandates action based upon substantive predicates. They argue, however, that (1) the substantive predicates were

not met because there was no determination by CPS that Oliver's abuse of Nicholas's siblings, Oliver Francis and Tyler, included either "battering," "torture," or "other severe physical abuse," terms which are not defined by the statute, and (2) § 722.638 does not mandate a particular substantive outcome.

## A.

In *Langdon*, *supra*, we held that § 722.638 "mandates a process based on a substantive predicate, not a particular outcome," and that under § 722.638,

> the substantive predicate is discretionary, not mandatory.  For the mandatory language requiring CPS to file a petition with the court to apply, CPS must first make a finding that a parent has abused the child with "[b]attering, torture, or other severe physical abuse."  Mich. Comp. Laws § 722.638(1)(a)(iii).  Michigan law does not define the terms "battering" or "torture," nor does it describe what conduct amounts to "severe physical abuse."  Mich. Comp. Laws § 722.622 (defining certain terms for the purposes of the child protection law).  It merely defines "child abuse," generally, as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment."  Mich. Comp. Laws § 722.622(f).

2013 WL 1662961, at *5.  We concluded that CPS's decision to file a petition "necessarily involves a broad amount of discretion," and noted that whether this court would have found sufficient evidence to prove neglect or abuse is not relevant; rather, "[w]hat matters is that CPS had the discretion to find none."  *Id.* (citation omitted).

In *Langdon*, the plaintiff alleged that CPS workers failed to properly investigate complaints of abuse and failed to file a petition under Mich. Comp. Laws § 722.638, where the teenage victim was being chained to her bed at night, purportedly for her own protection.  CPS investigated but closed the case and never made a finding of abuse.  In contrast, in the instant case the complaint asserts that Oliver pled guilty to child-abuse; that the prosecutor notified Montcalm CPS that Oliver had shocked Nicholas's brothers and CPS action was necessary; and that a CPS investigation established that Montcalm CPS was obliged to file a petition upon learning of the guilty plea.  Jasinski's complaint

goes beyond mere legal conclusions and adequately pleads that CPS was obliged to file a petition under Michigan law.

**B.**

The question remains, however, whether § 722.638 sufficiently mandates a particular substantive outcome, or whether it merely provides an expectation of receiving certain process. The district court concluded that it would be improper to parse the mandated-outcome prong so finely as to require a statute that dictates "the ultimate end, namely the child is out of the house and the parental rights are terminated." (Tr., PID 473.) The court concluded that the outcome was sufficiently substantive because it required CPS "to put a petition in the hands of some other branch of government to make a decision." (*Id.*)

In *Tony L.*, the plaintiffs argued that their procedural due process rights were violated based on the defendants' failure to enforce a Kentucky child-welfare statute that provided:

> Upon receipt of a report of an abused, neglected or dependent child . . . the designated agency . . . shall initiate a prompt investigation, take necessary action and shall offer protective services toward safeguarding the welfare of the child.

71 F.3d at 1185 (quoting Ky. Rev. Stat. § 620.050(3)). We found that although the statute established substantive predicates and used mandatory language, it failed to create a liberty interest because it did not mandate any particular substantive outcome. *Id.* at 1185–86. The requirement that an investigation be initiated only gave the plaintiffs "an expectation of receiving certain process." *Id.* at 1186. And the requirements that "necessary action" be taken and "protective services" provided, without further definition of those terms, did not provide the plaintiff with "an expectation that a particular result will follow from a particular, required action." *Id.*

*Tony L.* distinguished an earlier case, *Meador v. Cabinet for Human Resources*, 902 F.2d 474 (6th Cir. 1990), in which we found a liberty interest where a Kentucky child-welfare statute provided that the "[Cabinet of Human Resources] shall arrange for

a program of care, treatment and rehabilitation of the children committed to it," and that "the cabinet shall be responsible for the operation, management and development of the existing state facilities for the custodial care and rehabilitation of children." *Tony L.*, 71 F.3d at 1187 (citing *Meador*, 902 F.2d at 476–77). The court explained:

> No matter what action an official takes to further the safety of children in foster homes, only one relevant policy goal will be furthered:  the policy of making foster homes safe.  The exercise of official discretion will not affect the substantive outcome.  Thus, the existence of discretion in *Meador* did not defeat the plaintiffs' liberty interest.
>
> In the present case, however, competing policy goals exist.  When the Cabinet receives a report of child abuse, it must balance the need to protect the child with the need to protect the integrity of the biological family.  The exercise of discretion may affect the substantive outcome.  Thus, discretion is inherently necessary to effectuate the policy goals of the statutes in this case.  This was not true in *Meador*.

*Tony L.*, 71 F.3d at 1187.

In *Tony L.*, the statute required officials to "initiate a prompt investigation," "take necessary action," and "offer protective services."  *Tony L.*, 71 F.3d at 1185.  These requirements grant the officials who are subject to the mandate a broad degree of discretion to determine what actions are necessary, what services are sufficiently protective, and the course of the investigation.  Similarly, *Coker ex rel. Coker v. Henry*, 813 F. Supp. 567 (W.D. Mich. 1993), *aff'd* No. 93-1354, 1994 WL 228302 (6th Cir. May 25, 1994) (table), relied on by Defendants for the proposition that this court has already considered and rejected the argument that the Michigan Child Protection Law gives rise to a procedural due process claim, involved a section of the Child Protection Law that is virtually identical to the statutory language in *Tony L.  Coker* considered Mich. Comp. Laws § 722.628, which prescribes the procedures the department must follow when a report of child abuse is initially made.  That provision requires the commencement of an investigation, during which the department is required to take "necessary action to prevent further abuses, to safeguard and enhance the child's welfare, and to preserve family life where possible." *Id.*

Here, in contrast, the officials who are subject to the mandate of Mich. Comp. Laws § 722.638 must file a petition with the court and, where the suspected perpetrator is a parent, they must "include a request for termination of parental rights at the initial dispositional hearing." Mich. Comp. Laws § 722.638(2). The officials have no discretion to refrain from filing the petition. *See id.* ("The department *shall* submit a petition for authorization by the court . . . .") (emphasis added). Under the statutory language at issue in *Tony L.* and *Coker*, CPS retains the jurisdiction to determine what further actions, if any, are necessary. The statutes leaves CPS officials the discretion to balance the competing interests and exercise their discretion to conclude what measures are required, taking into account the home situation and the results of their investigations. Here, § 722.638 mandates that the child be brought within the jurisdiction of the court, and further determinations regarding the child's well-being and placement are made by the court, not CPS. Under the facts alleged here, the balance has been struck legislatively, and discretion has been removed from CPS. The Michigan Legislature has determined that if § 722.638 is satisfied, CPS must file a petition. All further determinations are made by the court.

Although we do not dispute *Langdon*'s conclusion that the substantive predicate in § 722.638 was not present under the facts of that case, to the extent the decision stands for the broad proposition that § 722.638 guarantees only a process based on a substantive predicate, we disagree. The court's assumption of jurisdiction in cases where the substantive predicates of § 722.638 are established is, in some instances, more than a mere expectation of process; rather, similar to *Meador*, once the court's jurisdiction is invoked, the court's paramount concern in placing the child is the safety of the child, and the court may not leave the child with the person whose actions resulted in the petition unless "the conditions of custody are adequate to safeguard the child from the risk of harm to the child's life, physical health, or mental well-being." Mich. Comp. Laws Ann. § 712A.13a. This determination is akin to the determination required under *Meador*, where the only consideration is the child's safety. This is in contrast to the balancing of interests that are operative when the court makes the final decision as to the termination of parental rights and parental placement under Mich. Comp. Laws Ann. § 712A.19(b).

This brings us to the issue of qualified immunity.  Given the previous decisions of our court, we cannot say that a reasonable CPS official would understand that the failure to file a petition under § 722.638 would constitute a denial of procedural due process.  No decision has yet found a procedural due process right in a similar context.  In the future, CPS officials are on notice that if a petition is mandated based on a substantive predicate, the failure to file a petition when the predicate is met may constitute a denial of procedural due process under statutes similar to the instant one.

## V. Gross Negligence

Defendants finally argue that the district court erred in concluding that Jasinski's state gross-negligence claim against the CPS employees was not barred under Michigan's Government Tort Liability Act ("GTLA"), Mich. Comp. Laws § 691.1407.  Under the GTLA, state employees acting within the scope of their authority and exercising a governmental function are entitled to immunity from tort liability as long as the employees' "conduct does not amount to gross negligence that is the proximate cause of the injury or damage."  Mich. Comp. Laws § 691.1407.

The Michigan Supreme Court has held that the phrase, "*the* proximate cause," in § 691.1407 does not mean "*a* proximate cause," as is usually the case in tort law, but rather "the one most immediate, efficient, and direct cause of the injury or damage."  *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000) (emphasis added) (passengers in a stolen vehicle that crashed during a high-speed police chase could not sue police officers because their pursuit of the stolen vehicle was not "the proximate cause" of the injury).  Jasinski cites authority discussing proximate cause in contexts not involving the tort liability of government employees.  However, *Robinson* clearly explains that the proximate-cause inquiry under the GTLA is different from proximate-cause analysis in other contexts because of the use of the definite article "the" in the GTLA.  *Robinson*, 613 N.W.2d at 318.

Defendants argue that their conduct does not subject them to liability under the GTLA because Oliver was the most immediate, direct, and efficient cause of Nicholas's death.  Jasinski responds that Defendants were the most immediate cause of Nicholas's

No. 10-2571        *Jasinski v. Tyler, et al.*                    Page 20

death because "Defendants' investigation and substantiation of the complaint of abuse was THE catalyst and THE cause of Nicholas' death."

The heightened "proximate cause" requirement articulated in *Robinson* forecloses Jasinski's gross negligence claim.  Without altogether ignoring Oliver's role in causing Nicholas's death, CPS employees' conduct cannot be said to be the "most immediate, efficient, and direct cause" of the injury.  Accordingly, Jasinski's state-law gross negligence claim must be dismissed.

### VI.  Conclusion

For the foregoing reasons, we **REVERSE** the judgment of the district court.